DANIEL J. MULLER, SBN 193396
dmuller@venturahersey.com
VENTURA HERSEY & MULLER, LLP
1506 Hamilton Avenue
San Jose, California 95125
Telephone:  (408) 512-3022
Facsimile:  (408) 512-3023

Daniel O. Herrera (*pro hac vice* anticipated)
Nickolas J. Hagman (*pro hac vice* anticipated)
nhagman@caffertyclobes.com
**CAFFERTY CLOBES**
**MERIWETHER & SPRENGEL LLP**
135 S. LaSalle St., Suite 3210
Chicago, Illinois 60603
Telephone:   (312) 782-4880
Facsimile:    (312) 782-4485

*Attorneys for Plaintiff*

## UNITED STATES FOR THE DISTRICT OF
## NORTHERN DISTRICT COURT CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| R.S., on behalf of himself and all others similarly situated,<br><br>                  Plaintiff,<br><br>          v.<br><br>BETTERHELP, INC.,<br><br>                  Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff R.S. brings this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against BetterHelp, Inc. ("BetterHelp" or "Defendant"). The allegations contained in this class action complaint are based on Plaintiff's personal knowledge as to facts pertaining to himself and upon information and belief, including further investigation conducted by Plaintiff's counsel.

## NATURE OF THE ACTION

1.     Plaintiff brings this class action lawsuit on behalf of a nationwide class to redress Defendant's improper, unauthorized, and illegal disclosure of the Class' personally identifiable information ("PII") and/or protected health information ("PHI") (collectively referred to as "Private Information") to third-party advertising platforms such as Facebook, Snapchat, and other similar entities.

2.     Health information is highly sensitive information and mishandling of such information carries grave consequences, such as potential discrimination in the workplace or denial of insurance coverages. If members of the public have doubts that such sensitive information will be kept private, they will be less likely to seek medical assistance or treatment, which will produce worse outcomes in the future. As such, ensuring the confidentiality of medical information and preventing its unauthorized disclosure to anyone other than a designated health care provider is absolutely necessary to maintain public trust in the healthcare system.

3.      Recognizing this reality, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

4.     Defendant developed an online, tele-counseling service that connected users with associated therapists for virtual mental health counseling services. Defendant used platforms such as the website www.betterhelp.com and the BetterHelp smartphone app to market, sell, and run

this service. The Defendant also launched and managed parallel platforms that targeted specific demographics and religions through websites such as www.teencounseling.com, www.faithfulcounseling.com, www.pridecounseling.com, and their related apps. These websites and their related apps shall be hereinafter referred to collectively as "Defendant's Website" or the "Website".

5.      Defendant found substantial success with its tele-counseling service and millions of users signed up to make use of its services. And in the process, these millions of customers entrusted Defendant with their sensitive Private Information. Defendant, for its part, recognized the sensitive nature of this private information and made multiple promises regarding its confidentiality and represented that it would only be used to facilitate the users' mental health therapy.

6.      Contrary to its representations and promises to keep the sensitive Private Information confidential and safe, however, Defendant installed web beacons and cookies on its website to track users and collect data and information about them that it could later monetize.

7.      This behavior from Defendant drew scrutiny (and ultimately) litigation from the United States Federal Trade Commission ("FTC"). In its formal complaint, the FTC accused the Defendant of continually breaking its promise to protect consumers' Private Information, instead using it to target existing and new customers with advertising for its service. The FTC alleged that the Defendant sold or disclosed the highly sensitive PI of its users, including sacrosanct PHI, to the largest online advertising companies in the world, such as Facebook, Pinterest, Criteo, and Snapchat over a 7-year period from 2013 to December 2020. The Defendant further allowed these advertising companies to use this information for their own purposes such as R&D and third-party advertising.

8.     The FTC also alleged that Defendant: (i) failed to employ reasonable measures to safeguard Private Information it collected from customers; (ii) failed to properly train its employees to protect Private Information when using it for advertising; (iii) failed to properly supervise staff in the use of Private Information; (iv) failed to provide customers with proper notice as to the collection, use, and disclosure of their Private Information; and (v) failed to limit how third parties could use customers' Private Information.

9.     The FTC's Director of its Bureau of Consumer Protection, Samuel Levine, recently stated, "Digital health companies and mobile apps should not cash in on consumers' extremely sensitive and personally identifiable health information," noting that the sale of this information constituted blatant "misuse and illegal exploitation."

10.     In response to the use of tracking and data collection technologies by companies offering health care services, the Office for Civil Rights at the U.S. Department of Health and Human Services ("HHS") recently published a bulletin concerning the Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (the "Bulletin"). The Bulletin warns that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

11.     Plaintiff brings this action on behalf of himself and the proposed class to seek legal and equitable remedies against the Defendant in order to rectify the illegal conduct and actions described herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where: the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

13.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and many of the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

14.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## DIVISIONAL ASSIGNMENT

15.     Pursuant to Civil Local Rule 3-2(c), a substantial part of the events giving rise to the claims brought in this Complaint occurred in Santa Clara County, California. Consequently, assignment of this action to the San Jose Division is appropriate.

## THE PARTIES

16.     Plaintiff R.S. is an adult citizen of the State of California. He brings this action anonymously to protect his confidential personal health information, which is protected under HIPAA.

17.     Defendant BetterHelp, Inc. is a Delaware corporation with a principal place of business at 990 Villa Street, Mountain View, CA 94041.

18.     Defendant does business under various other names in addition to BetterHelp, including Compile, Inc., Mytherapist, Teen Counseling, Faithful Counseling, Pride Counseling, Icounseling, Regain, and Terappeuta.

## FACTUAL ALLEGATIONS

### Background

19.     Defendant BetterHelp provides tele-counseling and other online mental health services through its various websites and apps, the primary portal being www.betterhelp.com. It has been in operation since 2013.

20.     In addition to its primary web portal, Defendant also operates other websites and apps that are targeted at specific demographics or focus on specific types of counseling. For example, Defendant launched www.regain.us in 2016 to offer marriage and relationship counseling. And www.teencounseling and www.priddecouseling were launched in 2017 to provide counseling services for teens and LGBTQ individuals respectively. Defendant also runs www.faithcounseling.com, which caters to Christian individuals.

21.     Over its decade of operation, Defendant has amassed over 2 million users and reported over 374,000 active users in the United States in 2022. Defendant earned in excess of $345 million in revenue in 2020 and more than double this figure in 2021 at $720 million in revenue.

### Defendant's Marketing Efforts

22.     Over its decade of operation, Defendant has focused heavily on advertising and marketing its admittedly novel tele-counseling services to consumers through traditional media platforms such as television commercials, radio advertisements, and podcast sponsorships, and

1    digital platforms such as search engine ads and ads run through third-parties such as Facebook,

2    Snapchat, Pinterest, and Criteo.

3        23.    Defendant spent millions upon millions on marketing and advertising. For

4    example, Defendant spent between $10-20 million on just Facebook advertising in 2020. This

5    heavy investment in advertising and marketing did prove highly successful for Defendant since

6    90,000 to 120,000 new users annually reported following Facebook advertisements to sign up for

7    Defendant's services.

8

9        24.    In its vast array of marketing campaigns and advertisements, Defendant

10   emphasized the concept of trust and conveyed to consumers that its services simply connected

11   potential customers with licensed therapists "who you can trust." Defendant also claimed that

12   customers using its therapists would "get the same professionalism and quality you would expect

13   from an in-office therapist, but with the ability to communicate when and how you want."





**Professional, licensed, and vetted therapists who you can trust**

Tap into the world's largest network of licensed, accredited, and experienced therapists who can help you with a range of issues including depression, anxiety, relationships, trauma, grief, and more. With our therapists, you get the same professionalism and quality you would expect from an in-office therapist, but with the ability to communicate when and how you want.

Get Matched to a Therapist

**Defendant's Intake Process**

25.    Defendant's customers pay between $60 and $90 per week to make use of

Defendant's services. In order to sign up for its virtual counseling services, a customer is also

required to fill out a rather lengthy intake questionnaire.

26.     This questionnaire asks deeply personal questions about the customer's private life with questions probing for information such as age, gender, marital/relationship status, and employment status. The questionnaire also asks if the customer identities as religious or as a member of the LGBTQ community, directing them to Faithful Counseling or Pride Counseling, respectively. In addition, teenagers are directed to Teen Counseling.

27.     The questionnaire also asks customers to rate and describe their physical health, eating habits, financial status, and sleep habits.

28.      The questionnaire also asks deeply personal questions about the mental health issues experienced by the customer and reasons why the customer is seeking therapy (*e.g.*, feelings of depression, anxiety, grief, etc.). These questions probe very deeply into the customer's psyche with questions into matters, such as whether they are "experiencing overwhelming sadness, grief, or depression," or whether they have experienced thoughts that they "would be better off dead or hurting yourself in some way."

**Defendant's Deceptive and Unfair Marketing Practices**

29.     As part of its enforcement action against the Defendant, The FTC conducted a major investigation into Defendant's marketing and PI handling practices. This FTC enforcement action being *In the Matter of BETTERHELP, INC.*, Docket No. 2023169, and this action and its precipitating investigation's findings are discussed below. The FTC complaint is attached as **EXHIBIT A**.

30.     The FTC investigation revealed the following concerning detail, among many, regarding Defendant's marketing practices:

"In 2017, Respondent delegated most decision-making authority over its use of Facebook's advertising services to a Junior Marketing Analyst who was a recent college graduate, had never worked in marketing, and had no experience and little training in safeguarding consumers' health information when using that

information for advertising. In doing so, Respondent gave the Junior Marketing Analyst carte blanche to decide which Visitors' and Users' health information to upload to Facebook and how to use that information. This same individual, who now holds the title 'Senior Marketing Analyst,' continues to oversee Respondent's use of Facebook's advertising tools.

Respondent provided this marketing analyst with little training on how to protect Visitors' and Users' health information in connection with advertising until 2021. In fact, while Respondent has purported to provide privacy training to its employees since 2015, it was not until 2021 that Respondent gave them any training specific to its business or advertising." Ex. A at 5.

31.    The FTC found that Defendant made multiple assurances to consumers regarding the privacy of all shared or disclosed information:

"Respondent has included privacy assurances throughout the Intake Questionnaire. Until November 2021, each Multi-Site displayed a banner at the top of each question, explaining that Respondent is merely asking for 'some general and *anonymous* background information about you and the issues you'd like to deal with in online therapy' (emphasis added) so that the Visitor can be matched 'with the most suitable therapist for you'

As Visitors proceed through the Intake Questionnaire, Respondent includes additional periodic privacy assurances. From at least August 2017 to December 2020, when a Visitor reached the question as to whether the Visitor was taking medication, the Visitor was shown the statement: 'Rest assured—any information provided in this questionnaire will stay private between you and your counselor.'". *Id.*

32.    The FTC also noted that Defendant had changed its privacy assurances throughout the time the platform was in operation:

"In December 2020, Respondent changed the statement to read: "Rest assured— *this information* will stay private between you and your counselor" (emphasis on alteration added). And in January 2021, Respondent changed it again to state: "Rest assured—*your health information* will stay private between you and your counselor" (emphasis on alteration added)'". *Id.*

33.    The FTC also found that the Defendant made promises about its use of customers' email addresses. Defendant had represented to visitors of the Faithful Counseling, Pride Counseling, and Teen Counseling websites that their email addresses would not be shared: "Your

email address is kept *strictly private*. It is never shared sold or disclosed to anyone. Even your counselor won't know your real email address" (emphasis added). *Id.* at 6.

34.    Hundreds of millions of website visitors and app users, including those similar to Plaintiff and Class Members who ultimately signed up for Defendant's counseling services, were presented with these repeated promises about the confidentiality of the Private Information they shared with Defendant. Despite these promises, however, Defendant shared and disclosed the users' PI for marketing purposes and sold users' email addresses for profit.

35.    The FTC found that much of the assurances and promises made by Defendant to its customers were false and that Defendant flagrantly violated the Plaintiff's and Class Members' privacy rights by disclosing highly sensitive PI to advertisers and other third parties. These damning findings can be found in the FTC's complaint. Some highlights from the complaint are discussed below:

- The intake questionnaire's privacy assurances were "displayed in large, high-contrast, unavoidable text," while Defendant's privacy policies were linked in "small, low-contrast writing that is barely visible at the bottom of the page." When Defendant added a banner at the bottom of each page in September 2020 disclosing its use of cookies, it still falsely stated: "We never sell or rent any information you share with us." *Id.* at 7-9. This was false.

- Defendant's privacy policies went through numerous iterations that each contained deceptive and misleading statements about Defendant's use and disclosure of Private Information. While Defendant disclosed it would use web beacons (including pixels) and cookies for certain limited purposes, it never disclosed that it would use or disclose Private Information for advertising purposes or to sell to third parties for their own purposes. *Id.* at 9-10.

- Defendant disclosed millions of Class Members' Private Information to advertisers including Facebook. Over 7 million email addresses were uploaded to Facebook, which "matched over 4 million of these Visitors and Users with their Facebook user IDs, linking their use of the Service for mental health treatment with their Facebook accounts." Defendant also allowed Facebook to "automatically track certain actions" of Website users known as "Events." Defendant "recorded and automatically disclosed these Events to Facebook through web beacons

[Defendant] had placed on each of the [Websites]." Defendant and Facebook used this data to target advertising to millions of Class Members. *Id*. at 10-12.

36.     On March 2, 2023, the FTC finalized and made public a Consent Order with Defendant that addressed the Defendant's deceptive and misleading business practices in collecting and using sensitive personally identifiable information and personal health information. The consent order also addressed the Defendant's disclosure of this sensitive information to third parties. This Consent Order is attached hereto as **EXHIBIT B**.

37.     Under the Consent Order, Defendant must pay $7.8 million to the FTC and be subject to various auditing and compliance monitoring procedures in connection with its privacy policies and handling of customer data and information. Defendant must also publish a Notice to its customers advising them of the FTC action and informing customers that (i) it will tell the advertising companies that received customers' information to delete it; (ii) it is no longer sharing customers' health information with other companies for advertising and it is no longer sharing customers' personal information for advertising without the customers' permission; and (iii) it will enhance its privacy program to better protect customers' personal health information, including participating in an independent audit program every two years for the next 20 years. Ex. B at 21-23.

**Defendant was Enriched and Benefitted from its Use and Disclosure of Plaintiff's and Class Members' Private Information.**

38.     By using and disclosing the Private Information of its customers to advertisers and other third-parties, Defendant was able to improve its marketing efforts. The improved marketing, in turn, drove hundreds of thousands of new customers to sign up for Defendant's services, each of whom paid between $60 and $90 per week for Defendant's counseling services.

39.     Defendant's disclosure of Private Information also hurt Plaintiff and the Class by depriving them of the financial value of their Private Information, which can be substantial. For example, internet service providers earn, by conservative estimates, $202 per user from the United States by mining and selling their data.

40.     Health information in particular is especially valuable. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[1] Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers".[2]

**IP Addresses Are Personally Identifiable Information**

41.     On information and belief, Defendant also disclosed and sold Plaintiff's and Class Members' Computer IP addresses. According to the FTC Investigation, it was the agency's impression that Defendant collected a consumer's IP Address as an Identifier. Ex. A at 2.

42.     An IP address is a unique number that identifies the address of a device connected to the Internet and it is used to identify and route communications on the Internet. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

---

[1] Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time Magazine (January 9, 2017), available at: https://time.com/4588104/medical-data-industry/ (last accessed April 7, 2023).
[2] Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, CNBC (December 18, 2019), available at: https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last accessed April 7, 2023).

43.     HIPAA considers an individual's IP address to be personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP 19 addresses. *See* 45 C.F.R. § 164.514 (2).
- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

44.     Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA.

**Defendant Violated Industry Standards**

45.     The medical provider's duty of confidentiality is deeply embedded in the rules and traditions of the medical profession and it forms the backbone of the physician-patient and hospital-patient relationship.

46.     The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

47.     AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy).

48.     AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de- identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

49.     AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…: . . . (c) release patient information only in keeping ethics guidelines for confidentiality.

50.     The Defendant, despite being a mental healthcare provider, failed to follow any of these rules and customs to safeguard its *patients*' sensitive personal information and health information.

## PLAINTIFF'S EXPERIENCE WITH DEFENDANT'S WEBSITE

**Plaintiff R.S.'s Experience**

51.     Plaintiff R.S. used Defendant's counseling services once in May, 2021 via his smartphone.

52.     He filled out the intake questionnaire and noted the Defendant's promises to keep this information confidential and paid for Defendant's services.

53.     Plaintiff R.S. read and relied upon Defendant's representations concerning its commitment to maintaining the confidentiality of Private Information communicated by consumers via Defendant's web platforms. Had Plaintiff R.S. known that Defendant would not maintain his information as private and confidential, he would not have purchased Defendant's services or would have paid less for them.

54.     Plaintiff R.S. reasonably expected that his communications with Defendant via the Website and app were confidential, solely between himself and Defendant and his therapist, and that such communications would not be disclosed to a third party.

55.     On information and belief and based on Defendant's standard practices as described herein and in the FTC complaint, Defendant disclosed Plaintiff R.S.'s Private Information and

communications to third parties, including when he completed his intake questionnaire on Defendant's Website.

56.     Through the process detailed in this Complaint, Defendant disclosed Plaintiff R.S.'s communications and Private Information, including those that contained personally identifiable information, protected health information, and related confidential information, to third parties. Defendant never disclosed to Plaintiff R.S. that it would disclose, sell, or otherwise share his Private Information with third parties. Instead, Defendant disclosed Plaintiff R.S.'s Private Information without his knowledge, consent, or express written authorization.

57.     Plaintiff R.S. has an active Facebook account that he accesses on his computer and smartphone. Plaintiff R.S. also has active accounts with Instagram and Snapchat that he accesses on his computer and smartphone.

58.      On information and belief, information disclosed by Defendant to Facebook included Plaintiff R.S.'s Facebook ID and allowed Facebook to link his Private Information to his Facebook account, allowing Facebook to target ads to Plaintiff R.S.

59.     Thus, Defendant misrepresented the manner in which it handled Plaintiff R.S.'s Private Information and unlawfully disclosed Plaintiff R.S.'s Private Information.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this action on his own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4).

The Nationwide Class

All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through a BetterHelp Website or App (including, but not limited to, betterhelp.com, teencounseling.com, faithfulcounseling.com, pridecounseling.com, and regain.us).

61.     In the alternative to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure, Rule 23(c)(5), Plaintiff seeks to represent the following State Class:

<u>The California Class</u>

All individuals who are residents of the State of California whose Private Information was disclosed to a third party without authorization or consent through a BetterHelp Website or App (including, but not limited to, betterhelp.com, teencounseling.com, faithfulcounseling.com, pridecounseling.com, and regain.us).

62.     Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

63.     Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

64.     <u>Numerosity</u>: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that millions of individuals comprise the Class based on the number of individuals reported to have signed up for the Defendant's service. The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

65.     <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to each Class exist and predominate over any questions affecting only individual Class Members. These include:

a.     Whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' PII and PHI;

b.   Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c.   Whether Defendant violated its Privacy Policies by disclosing Plaintiff's and Class Members' Private Information to Facebook, Snapchat, Pinterest, Criteo, and/or additional third parties;

d.   Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

f.   Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

g.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information;

h.   Whether Defendant violated the consumer protection statutes invoked herein;

i.   Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j.   Whether Defendant knowingly made false representations as to its data security and/or Privacy Policies practices; and

k.   Whether Defendant knowingly omitted material representations with respect to its data security and/or Privacy Policies practices.

66.   Typicality: All of Plaintiff's claims are typical of the claims of the Class since Plaintiff and all members of the Class had their Private Information wrongfully disclosed by Defendant. Plaintiff and the members of the Class sustained damages as a result of Defendant's uniform wrongful conduct.

67.   Adequacy: Plaintiff is an adequate representative because his interests do not materially or irreconcilably conflict with the interests of the Class he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and intends

to prosecute this action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the Class. Neither Plaintiff nor his counsel have any interests that are antagonistic to the interests of other members of the Class.

68. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, inter alia, Defendant's records and databases.

## COUNT I
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class)

69. Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

70. When Plaintiff and Class Members provided their Private Information to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

71. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

72.     Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

73.     Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to third parties, including Facebook, Snapchat, Pinterest, and Criteo.

74.     As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially for these services, had they known their Private Information would be disclosed.

75.     Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT II**
**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200**
**(On behalf of Plaintiff and the Class)**

76.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

77.     This Count is plead in the alternative to the breach of contract count above.

78.     California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

79.     Defendant engaged in unlawful business practices in connection with its disclosure of Plaintiff's and Class Members' Private Information to unrelated third parties, including Facebook, Snapchat, Pinterest, and Criteo, in violation of the UCL.

80.     Defendant violated the "unlawful" prong of the UCL by violating, inter alia, Plaintiff's and Class Member's constitutional rights to privacy, state and federal privacy statutes, and state consumer protection statutes, such as HIPAA and the California Confidentiality of Information Act ("CMIA"). Defendant also violated the unlawful prong of the UCL by disseminating false and misleading statements regarding its privacy practices in violation of California's False Advertising Laws.

81.     Defendant's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct, as alleged herein, offended public policy (including the aforementioned federal and state privacy statutes and state consumer protection statutes, such as HIPAA and CMIA and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiff and Class Members.

82.     Defendant's acts, omissions, and conduct also violate the fraudulent prong of the UCL because Defendant made material misrepresentations and omissions of fact to induce Plaintiff and Class Members to purchase Defendant's services without disclosing that Defendant shared, used, and sold Plaintiff's and Class Members' Private Information and without obtaining consent. Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and likely to deceive the consuming public.

83.     Plaintiff viewed and relied upon Defendant's representations concerning the confidentiality of information provided by Plaintiff and Class Members to Defendant. Had Defendant disclosed that it shared Private Information with third parties, Plaintiff would not have purchased Defendant's services or would have paid considerably less for those services.

84.     Defendant's conduct also constitutes "unfair" conduct. The harm caused by the Defendant's conduct outweighs any potential benefits attributable to such conduct and there were

reasonably available alternatives to further Defendant's legitimate business interests other than Defendant's conduct described herein.

85.    The acts, omissions, and conduct of Defendant were controlled, directed, and emanated from its California headquarters.

86.    The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

87.    As result of Defendant's violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Defendant and/or other valuable consideration, *e.g.*, access to their private and personal data. The unauthorized access to Plaintiff's and Class Members' private and personal data also has diminished the value of that information.

**<u>COUNT III</u>**
**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code § 17500**
**(On behalf of Plaintiff and the Class)**

88.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

89.    This Count is plead in the alternative to the breach of contract count above.

90.    The acts, omissions, and conduct of Defendant were controlled, directed, and emanated from its California headquarters.

91.    California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading

and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

92.     Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading. Defendant also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

93.     Defendant's statements include but are not limited to representations and omissions made to consumers in the intake questionnaire and privacy policy regarding Defendant's commitment to maintain the privacy of Private Information and not to disclose Private Information to third parties. Such representations and omissions constitute false and deceptive advertisements.

94.     Plaintiff viewed and relied upon Defendant's representations concerning the confidentiality of information provided by Plaintiff and Class Members to Defendant. Had Defendant disclosed that it shared Private Information with third parties, Plaintiff would not have purchased Defendant's services or would have paid considerably less for those services.

95.     Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived. Plaintiff and Class Members were deceived by Defendant's statements and omissions made online when they signed up and started paying for Defendant's services, and there is a strong probability that consumers and members of the public were also or are likely to be deceived as well. Any reasonable consumer

would be misled by Defendant's false and misleading statements and material omissions. Plaintiff and other members of the Class did not learn of Defendant's disclosure of their Private Information until after they had already signed up and paid for Defendant's services and the FTC settlement was announced. They relied on Defendant's statements and omissions to their detriment.

96.     Plaintiff and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased Defendant's services on the same terms if the true facts were known about the product and the services do not have the characteristics promised by Defendant. Plaintiff, individually and on behalf of all similarly situated consumers, seeks individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with its false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

## COUNT IV
## VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT
### Cal. Civ. Code § 56, *et seq.*
### (On behalf of Plaintiff and the Class)

97.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein

98.     The California Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code § 56, *et seq.*, prohibits health care providers from disclosing medical information relating to their patients without a patient's authorization. "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care… regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of

personal identifying information sufficient to allow identification of the individual..." Cal. Civ. Code § 56.05.

99.     Defendant is a healthcare provider as defined by Cal. Civ. Code § 56.06.

100.     Plaintiff and Class Members are patients, and, as a health care provider, Defendant has an ongoing obligation to comply with the CMIA's requirements.

101.     As set forth above, names, addresses, telephone numbers, email addresses, device identifiers, web URLs, Internet Protocol (IP) addresses, and other characteristics that can uniquely identify Plaintiff and Class members are transmitted in combination with patient mental health concerns, treatment(s) sought, medications, and whether the patient is suffering from anxiety, depression, or a number of other mental health symptoms. This protected health information and personally identifiable information constitutes confidential information under the CMIA. This information is collected, recorded, and stored by Defendant and intentionally disclosed to third parties without Plaintiff's and Class Members' knowledge or consent.

102.     Facebook ID is also an identifier sufficient to allow identification of an individual. Along with patients' confidential Private Information, Defendant discloses to Facebook the patient's FID.

103.     Pursuant to the CMIA, the information communicated to Defendant and disclosed to third parties constitutes medical information because it is patient information derived from a health care provider regarding patients' medical treatments and physical and mental conditions and is in combination with individually identifying information. Cal. Civ. Code § 56.05(i).

104.     As set forth above, Facebook and other third parties view, process, and analyze the confidential medical information it receives from Defendant and uses that Private Information for advertising and marketing purposes.

105.    As demonstrated hereinabove, Defendant fails to obtain its patients' authorization for the disclosure of medical information and fails to disclose in its Website Privacy Policy that it shares protected health information with third parties for their marketing purposes.

106.    Pursuant to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; (4) state a specific date after which the authorization expires. Accordingly, the information set forth in Defendant's Website Privacy Policy and any Terms and Conditions do not qualify as a valid authorization.

107.    Based on the above, Defendant is violating the CMIA by disclosing its patients' medical information to third parties along with the patients' individually identifying information. Accordingly, Plaintiff and Class Members seek all relief available for Defendant's CMIA violations.

108.    Plaintiff and Class Members seek nominal damages, compensatory damages, punitive damages, attorneys' fees and costs of litigation for Defendant's violation of the CMIA.

## COUNT V
### UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Class)

109.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein

110.    This Count is pleaded in the alternative to the breach of contract count above.

111.    Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

112.     Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

113.     Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

114.     The benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in California and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

115.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civil Code §§ 1750**
**(On behalf of the California Class)**

116.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein

117.     The California Consumer Legal Remedies Act ("CLRA") makes it unlawful for businesses to engage in unfair or misleading acts when selling goods or services to consumers.

118.     Defendant committed a misleading and unfair act under this Act when it represented to its customers, the California Class, that all private information and private health

information they shared with Defendant would be kept confidential and not disclosed without express authorization, while disclosing and disseminating this information to third-parties for advertising, research, pecuniary, and for other purposes.

119.    Defendant's aforementioned misleading and unfair act transpired as part of a commercial transaction between it and the California Class during Defendant's intake process for potential new customers and during the course of an ongoing business relationship between it and its customers.

120.    Defendant's aforementioned misleading and unfair acts were committed *intentionally* and were not the result of any bona fide errors and Defendant has, to this day, not made any attempt to correct or remedy its behavior.

121.    Members of the California Class would not have paid money for Defendant's services, or would have paid substantially less for them, if they knew that the sensitive information they shared with Defendant were being disclosed to third parties. As such, the California Class were damaged by Defendant's misleading and unfair action.

122.    On or about April 12, 2023, Plaintiff provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a), and thus seek only injunctive relief at this time. After the 30-day notice period elapses, Plaintiff intends to amend this Complaint to seek monetary damages, including actual, restitutionary, and punitive damages. Plaintiff's and the other Class members' injuries were proximately caused by Defendant's fraudulent and deceptive business practices. Therefore, Plaintiff and the California Class members will seek all relief available under the CLRA.

## **PRAYER FOR RELIF**

WHEREFORE, Plaintiff, individually and on behalf of all members of the Class, respectfully requests that this Court enter judgment in his favor and against the Defendant as follows:

A.   That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B.   That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.   That the Court award Plaintiff and the Class Members compensatory, consequential, and general damages in an amount to be determined at trial;

D.   That the Court award Plaintiff and the Class Members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E.   That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F.   That the Court award pre- and post-judgment interest at the maximum legal rate;

G.   That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H.   That the Court grant all other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

Plaintiff, individually and on behalf of the Class, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: April 14, 2023                    Respectfully submitted,


/s/ Daniel J. Muller
Daniel J. Muller
VENTURA HERSEY & MULLER, LLP

/s/ Daniel O. Herrera
Daniel O. Herrera (*pro hac vice* anticipated)
Nickolas J. Hagman (*pro hac vice* anticipated)
CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP

*Attorneys for Plaintiff and the Proposed Class*